### THE BROOKBY.

(District Court, E. D. Pennsylvania. November 20, 1908.)

No. 9.

1. SHIPPING (§ 84*) — FELLOW SERVANTS — WINCHMAN AND STEVEDORE'S EMPLOYÉS.

A winchman furnished by a vessel from its crew to operate a winch while the vessel was being discharged by a stevedore employed by a charterer, and who while engaged in such work was subject to the orders

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of the stevedore, was a fellow servant with the latter's employés engaged in the work.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 84;* Master and Servant, Cent. Dig. §§ 485–492.]

2. SHIPPING (§ 84*) — INJURY TO STEVEDORE—LIABILITY OF VESSEL—INCOMPE-
TENT WINCHMAN.

Libelant was employed by a contracting stevedore in discharging a vessel of a cargo of iron ore, and while at work in the hold was injured through the negligence of the winchman, who was a seaman furnished by the vessel. He operated the winch so carelessly as to endanger the workmen, and three several complaints had been made by the foreman and hatch-tender to the officer in command of the vessel prior to libelant's injury. *Held*, that the winchman's conduct and the complaints made were such as to require his removal, and that his retention was negligence which rendered the vessel liable for libelant's injury.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 84.*]

In Admiralty. Suit by stevedore for personal injury.

Howard M. Long, for libelant.

Convers & Kirlin and Henry R. Edmunds, for respondent.

J. B. McPHERSON, District Judge. This is an action in rem against the British steamship Brookby, brought by a laboring stevedore to recover damages for an injury received while he was helping to unload the vessel. The accident happened on February 6, 1907, under the following circumstances:

The steamship was under charter, and had brought a cargo of iron ore to the city of Philadelphia. It was the duty of the charterers to unload the ore, and in fulfillment of that obligation they had made a contract with a master stevedore, by whom the libelant was employed as an ordinary laborer. The ship had nothing to do with the discharge of the cargo except to furnish the winchmen and the necessary gear. After the winchmen were chosen by the ship, they were subject to the orders of the master stevedore, or his representatives, in all matters pertaining to the operation of the winches. They could not be removed by him, but, if they should prove to be careless or incompetent, the duty of making complaint to the ship about their lack of efficiency would rest upon him, and the duty of taking proper steps upon such complaint would then rest upon either the master or the mate, whichever might be in charge of the vessel. On the day in question, the libelant had been working in No. 2 hold for several hours, helping to fill the iron buckets that were used in hoisting the ore, when a loaded bucket that had been lifted to the level of the hatch coamings suddenly and with great rapidity descended again into the hold without warning, struck the empty tub which the libelant was filling, and then struck him, inflicting the injury complained of. There is no charge of contributory negligence, and the first matter for consideration, therefore, is the libelant's averment that he was hurt by the neglect of the winchman. Upon this point no time need be spent. It is conceded that the unexpected and rapid descent of the bucket was due to the mistake of the winchman in the management of the steam, and this mistake was negligence for

which the ship must respond, unless the defenses that are set up present a sufficient reply to the libelant's case.

The first of these defenses is founded on the doctrine of fellow servant. An attempt was made by the libelant to show that the winchman was wholly a servant of the ship and in no sense a servant of the master stevedore, but the evidence upon this point is not sufficient. No doubt the winchman was an able seaman on the ship's articles, and was paid, fed, and lodged by the vessel while he was operating the winch. It is also true that the ship could have ordered him away at any time and assigned him to other duty, and that he would have been bound to leave the winch and obey such order; but the essential fact remains that, while he was operating the winch, and throughout the course of that service, he was put under the control and direction of the master stevedore, or of his representatives in charge of the work of unloading the cargo. It was his duty to obey the signals of the hatch-tender, whether given by the voice or by the hand, and to hoist or lower the buckets as he might be directed. Under such circumstances, the winchman was a fellow servant of the libelant, both of them working at the time in the common employment of discharging the cargo, and both being under the general control and direction of the master stevedore. This has been unequivocally decided in The Elton, 142 Fed. 367, 73 C. C. A. 467, a case wherein the Court of Appeals of this circuit dissents from the conclusion reached by the Second Circuit in The Slingsby, 120 Fed. 748, 57 C. C. A. 52, a decision which has been urged upon us as controlling the present dispute. Obviously, The Elton and not The Slingsby lays down the rule that should now be applied, and I need do no more than refer to the opinion of the Court of Appeals, delivered by Judge Gray, for a statement of the reasons upon which the decision is founded.

Anticipating this ruling, the libelant takes the further position that, even if it be conceded that he and the winchman were fellow servants, the action is nevertheless sustainable, because the winchman was found to be careless and incompetent, and because the ship failed to remove him after due complaint had been made to the officer who was then in command. The testimony established the facts that the winchman was an able seaman who had had several years' previous experience in the operation of winches, and that he was a competent person to be chosen for that service on this occasion. With these facts in proof, if the evidence went no further than to charge him with carelessness in doing the act that caused the libelant's injury, The Elton is also authority for the proposition that "an allegation of negligence against a master in employing an incompetent servant is not sustained by proof of a single act of negligence on the part of the servant which caused the injury sued for." The libel and the evidence in the present case, however, go further than this. The libel avers that the master of the ship "had placed in charge of the said steam winch, used for hoisting the freight from the hold of the said steamship, an ignorant, incompetent, and careless seaman, one of the crew of the said steamship, and that the said master knew of

the said seaman's incompetency, ignorance, and carelessness at the said time, or by the exercise of ordinary care and diligence might have known thereof," etc. In support of this averment, testimony was offered to prove that on the day in question, but before the libelant was injured, the winchman had been misconducting himself in the performance of his work, and that, although complaint was promptly made of his behavior to the officer in command of the ship, he was not removed, but was permitted to continue the operation of the winch. If these facts be true, they present a question that was not decided by The Elton, and it has therefore been necessary to examine carefully the testimony upon this point. From such examination, and after deciding what credence should be given to the witnesses who have offered conflicting accounts of what took place, I think the following statement fairly presents the occurrences of that day before the hour of half past 4 in the afternoon, when the libelant was injured:

Almost from the beginning of his service in the morning, the winchman declined to operate the winch upon the signals of the hatchtender, declaring his ability to run it to suit himself. The proper method of raising a loaded bucket that comes from another part of the hold than the part directly beneath the hatch is to move it slowly so that the unavoidable swinging may be as slight as possible, and, after it has been brought to the space beneath the hatch, to lower it a little so as to steady it, and then to raise it above the coamings. Instead of pursuing this method, the winchman frequently moved the bucket rapidly and with a jerk, "snatching" it as one of the witnesses said, and swinging it about the hold so that the laborers were obliged to run out of the way. Instead of steadying the buckets, he sometimes hoisted them while they were swinging, in consequence of which they struck the coamings and spilled out some of the ore. After the buckets reached the deck, and while they were being swung over to the railroad cars that were awaiting the ore, he slacked the fall to which the buckets were attached so rapidly on several occasions that the buckets could not be swung properly by the workmen on shore, but were knocked against the cars or the rail of the ship. His management of the winch was so careless as to threaten the safety of the laborers, and the hatch-tender complained to the foreman, who in turn repeated the complaints to the mate. This notice of the winchman's improper conduct was given twice by the foreman, and once by the hatch-tender. In response to the foreman's communications, the mate apparently admonished the winchman, but no attention seems to have been paid to the complaint made by the hatch-tender. For a short time after the mate's intervention, the winchman appears to have acted more prudently, but the improvement in his method of operation was not permanent. After the mate had gone away, the same grounds of complaint appeared again, and there were similar reasons to fear that injury might result. This carelessness of operation was not continuous during the day, but it was apparent often enough to justify the fear of injury and to warrant the complaints that were made.

In my opinion, these facts called for the removal of the winchman, and, as this was exclusively within the power of the mate—who was then in charge of the ship, the master being absent—the failure to exercise such power was negligence for which the vessel must respond. It is a well-settled rule that a master must not only exercise due care in the employment of his servants, but must also exercise such care concerning their retention. This duty requires the removal of an incompetent or negligent servant, after the master knows, or has reasonable opportunity to know, of his fault. Wabash R. R. Co. v. McDaniels, 107 U. S. 454, 2 Sup. Ct. 932, 27 L. Ed. 605; The Anaces, 93 Fed. 240, 34 C. C. A. 558; Southern Pacific Co. v. Hetzer, 135 Fed. 272, 68 C. C. A. 26, 1 L. R. A. (N. S.) 288; Balt. & Ohio R. R. Co. v. Henthorne, 73 Fed. 634, 19 C. C. A. 623; Southern Pacific Co. v. Huntsman, 118 Fed. 412, 55 C. C. A. 366. The degree of care to be exercised by the master, whether in the appointment or the retention of his servants, varies with the character of the work and the responsibility that they are required to undertake. To use the language of the Supreme Court in Wabash R. R. Co. v. McDaniels, on page 460 of 107 U. S., on page 937 of 2 Sup. Ct. (27 L. Ed. 605):

"Ordinary care in the selection and retention of servants and agents implies that degree of diligence and precaution which the exigencies of the particular service reasonably require. It is such care as, in view of the consequences that may result from negligence on the part of employés, is fairly commensurate with the perils or dangers likely to be encountered."

In the case of a winchman upon whose competency or carefulness the safety and the lives of others may in large measure depend, the master should, I think, be more than usually cautious. No definite rule can be laid down concerning his obligation to remove such a servant; obviously, each case must be judged according to its own circumstances, but I think it is safe to say that, where a winchman has misbehaved as plainly and as frequently as this evidence discloses, and where his conduct has been brought to the attention of the officer who has power to remove him, the remedy by repeated admonition was inadequate, and the remedy by removal should have taken its place.

An amendment to the libel charges as a further fault on the part of the ship that the winch was defective, but no attempt was made to prove this averment, and it need not be further noticed.

A decree with costs may be entered in favor of the libelant. If it be desired, a commissioner will be appointed, or the parties may take additional evidence on the subject of damages within 30 days, and lay it before the court, with or without further argument, as they may prefer.