## THE ELTON.

(Circuit Court of Appeals, Third Circuit. January 2, 1906.)

No. 24.

1. MASTER AND SERVANT—NEGLIGENCE OF MASTER—EVIDENCE OF SERVANT'S INCOMPETENCY.

An allegation of negligence against a master in employing an incompetent servant is not sustained by proof of a single act of negligence on the part of the servant which caused the injury sued for.

2. SAME—PLEADING—VARIANCE.

In a suit against a vessel to recover for an injury to a stevedore, where the only ground of liability alleged and relied upon at the trial was that the master employed an inexperienced and incompetent winchman, a recovery is not authorized by evidence of a single act of negligence on the part of the winchman on the occasion of the accident, since the libel cannot be construed as covering such ground of liability.

3. SAME—HIRING SERVANT TO THIRD PARTY—LIABILITY FOR NEGLIGENCE.

The consignee of a cargo exercised its option to discharge the cargo, being allowed a deduction from the freight therefor, and the vessel being required to furnish steam, winches, and men to operate the same. The winchmen so furnished acted under the immediate orders of the master stevedore employed by the consignee. *Held* that, if ordinary care was exercised by the master of the vessel to furnish competent winchmen, the vessel was not liable for an injury to a stevedore resulting from a negligent act of one of the winchmen.

4. SAME—FELLOW SERVANTS.

In such case the stevedore and winchman were fellow servants of the contracting stevedore; both being at the time working in a common employment under the same general control and direction.

[Ed. Notes.—Who are fellow servants, see notes to Northern Pac. R. Co. v. Smith, 8 C. C. A. 668; Flippin v. Kimball, 31 C. C. A. 286.]

Appeal from the District Court of the United States for the Eastern District of Pennsylvania.

For opinion below, see 131 Fed. 562.

J. Parker Kirlin, Henry R. Edmunds, and John M. Woolsey, for appellant.

Allen C. Thomas, for appellee.

Before ACHESON, DALLAS, and GRAY, Circuit Judges.

GRAY, Circuit Judge. This is an appeal from a final decree of the United States District Court for the Eastern District of Pennsyl-

vania, sitting in admiralty. The appellee filed his libel to recover damages for personal injuries alleged to have been incurred on board the steamship "Elton," while she was discharging iron ore at the port of Philadelphia, on the morning of July 17, 1902.

The libelant was a stevedore, who, at the time of his accident, was working on the steamship "Elton" as an employé of a master stevedore, who was unloading iron ore from the steamship under a contract with the consignees of the cargo. Upon the 17th day of July, 1902, he was in the hold of said vessel, in the alley of the third hatch, between the shaft and the inshore side. The libel alleges that his duties required him to fill empty buckets with iron ore, as they were lowered down to him, by means of a chain leading over a pulley, from the boom or gaff. At the time of the accident, while libelant was in the act of loading one of the buckets or tubs, another bucket or tub, which was suspended from another gaff or boom, came with great force and struck him on the back, causing the injuries complained of.

After stating the character of the injuries, the libel alleges that:

"The gaff or boom, to which the bucket or tub was attached which fell upon the libelant, was constructed in a faulty and negligent manner by the master of the ship, and was in charge of one of the crew of the ship. The said master had knowledge that the said gaff or boom was constructed in an unsafe manner, and the man in charge of lowering the buckets or tubs was an inexperienced and incompetent person. The libelant exercised due care and precaution, and in no manner contributed to the said injuries, but the same were solely caused by the negligence and carelessness of the respondents, in improperly constructing the boom or gaff, and in allowing the same to be managed by an incompetent and inexperienced person. Wherefore the libelant claims," etc.

These are the allegations, and the only allegations, of fault on the part of the steamship company. The answer denies all of them, and sets up in further answer, a separate defense, that the hatch, where libelant was working, was adequately supplied with proper appliances for the discharge of the cargo, so far as the ship was concerned, and that the preparations for the discharge and the operation of discharging was entirely in the hands and under the control of an independent contracting stevedore, employed by the consignees, and that none of the ship's officers or men had any supervision or control over these operations.

By the charter party, the ship was pledged to deliver the cargo at Philadelphia "afloat," "where and as directed by the consignees," and it was agreed that the consignees were to unload the ship, and for so doing were to be paid 35 cents per ton (this payment being actually made by a deduction from the freight), and that the ship was to furnish to the consignees, or those engaged in the operation of discharging the cargo, the ship's winches, together with the steam and men necessary to operate the same.

Pursuant to its undertaking, the ship delivered its cargo "afloat," alongside of the wharf in Philadelphia, as directed by the consignees, who, according to the privileges accorded them in the charter party, engaged a master stevedore to unload the ship. Under this arrange-

ment, the unloading was undertaken by the master stevedore, who, as soon as the steamer was brought to the wharf on July 15th, sent on board his foreman to rig the hoisting gear. The hoisting apparatus consisted of four derricks with the running rigging, one at each hatchway, the hauling part of the rope from each of which was carried to a steam-operated winch. The stevedore in charge proceeded at once to the unloading with his own men and foreman, using the ship's winches and the men furnished to operate them. The work proceeded until the 17th. Somewhere about 10 o'clock in the morning of that day, the libelant, one of the stevedore's workmen, was, as stated above, shoveling ore into buckets lowered into the hold through hatch No. 3, by the regular derrick for that hatch and by an extra gaff or boom rigged that morning by the stevedore in charge. The hoisting and lowering was accomplished, not by the winch at No. 3 hatch, which was being used in the operation of the regular derrick for that hatch, but by a winch at No. 4 hatch, some 25 to 30 feet away. This extra gaff or boom was furnished, as well as placed in position, rigged and attached to No. 4 winch, by the stevedore in charge, upon his own judgment and for his own purposes in unloading the cargo. The lowering and hoisting of the iron buckets was done by the winches, operated by winchmen under the direction and supervision of one of the stevedores stationed at the hatch for that purpose. It appears from the evidence that the No. 4 winch was so situated that one of the masts of the ship was between it and the hatch, and that the man operating the winch was obliged to stand with his back partially turned toward said hatch. The directions for hoisting and lowering were given by the man in charge at the hatch, by raising his hand to indicate an upward motion, the reverse for a downward motion, and waving his hand to stop. It is in evidence that Flynn, the winchman at No. 4, had not worked at No. 3 hatch until the morning of the accident, having been engaged in work of the same kind at the derrick for No. 4 hatch. There is a conflict of testimony as to how long he had been at work that morning at No. 3 hatch; one or more of the libelant's witnesses stating that he had hoisted but one bucket, and others that he had hoisted five or six. The evidence shows that the method of unloading was to hoist the loaded bucket part of the way to the hatch opening, until it had cleared the box covering over the shaft, which was several feet high from the bottom of the hold, and to then lower the bucket till it rested on the shaft box covering, and after it was thus steadied amidship, to raise it out of the hatch.

The only direct testimony as to the cause of the accident, is that of the stevedore in charge at the hatch, who gave the signals, and the winchman to whom they were given. The former says that he gave the signal to hoist the bucket, and then to lower it, and then to stop, but that instead it was lowered all the way down, striking the libelant and causing the injuries complained of. The winchman says that he obeyed the signals that were given him, first to raise and then to lower, and then he received no signal to stop.

The court sustained the libel, and found "from all the evidence and

142 F.—24

circumstances, that this injury resulted from the negligence of the winchman," and a decree was entered for the damages ascertained in favor of the libelant. The important assignments of error are the following:

"Second. That the court found that the libelant had maintained the burden of proof as regards the charges of negligence set forth in the libel."

"Fourth. In that the court did not hold that the libelant had failed to maintain the burden of proof laid on him, to show that the winchman was incompetent, or that his incompetency was known to or should have been known to the master of the steamship or any of her officers."

"Seventh. In that the court did not find that the accident was not due to any negligence on the part of the winchman, or of any one for whom the steamship, its owners or the appellant, may have been responsible.

"Eighth. In that the court did not find that the winchman was a fellow servant of the libelant."

In considering these assignments, we are met at the threshold with the question, whether the learned judge of the court below was justified in finding the ship guilty of the fault and negligence charged in the libel. Referring to the charging part of the libel, already quoted, it appears that the negligence charged was twofold; first, the negligence and carelessness of the respondents, in improperly constructing the boom or gaff, and second, the negligence and carelessness of the respondents, in allowing the same to be managed by an incompetent and inexperienced person. There is also the specific charge that the master of the ship had knowledge that the gaff or boom was constructed in an unsafe manner, and that the man in charge of lowering the buckets or tubs, was an inexperienced and incompetent person.

It is admitted that the first branch of this charge, to wit, that of negligence in improperly constructing the boom or gaff, is not sustained. No testimony was adduced in support of this charge, no contention is made by counsel for appellee in regard to it, and the court below does not refer to it in its findings. The only allegation of negligence, therefore, to be considered, is that of negligence and carelessness of the respondents, in furnishing an incompetent and inexperienced person to operate the winch. This is a definite and well understood ground of liability. In character, it differs widely from that of an isolated act of negligence by an employé, while engaged in the work of his employer, and for which, under certain circumstances, liability may be imputed to such employer. The distinction between the two grounds of liability is not merely technical and artificial, but is of substance, and inheres in every question as to a master's responsibility, and is necessary to be observed and kept in mind whenever the liability of a master for the negligent act of his servant is under consideration. The law imposes upon the master the duty of exercising ordinary and reasonable care in the selection of his servants, to see that they are qualified and competent to perform the service required of them. When such care is exercised, the master's personal duty is fulfilled. If this personal duty is violated by the master, he is responsible to any one who suffers an injury as the direct and immediate consequence of such breach of duty. It is manifest that such an act of negligence is of a personal and, in a certain sense, a moral

character. It belongs to the domain of human conduct and the exercise of free will, and the direct responsibility incurred thereby has something of the quality of penalty for a dereliction of duty. Plainly distinguishable in this respect are those cases, where, notwithstanding the fact that the master has fully complied with the obligation resting upon him, to exercise due and reasonable care in the selection and continued employment of his servants, a specific and single act of negligence of the servant is imputed to the master, and he is made legally liable for the injury which may result as a direct consequence of such negligent act. Where such liability is alleged, there need be no suggestion that the master himself has failed in the performance of any duty which he should have personally performed. On the contrary, his liability in such cases arises from no dereliction of duty by him personally, and consists with the assumption that he had done everything reasonably possible to human foresight and care to guard against the accident, responsibility for which is imputed to him.

This distinction conspicuously inheres in the familiar so-called doctrine of fellow servant, and is necessary to a correct understanding of what are the risks assumed by a servant when entering upon his employment. While among the risks thus assumed, is that of the negligence of a fellow servant, there is never an assumption of risk arising from the personal negligence of the master. The master's duty to exercise reasonable care to provide a safe place and safe appliances in and with which to work, and to employ skillful and competent servants, can never be so delegated by the master as to relieve him from liability to his servant for negligence in the performance of this duty.

Keeping in view these familiar and somewhat elementary principles of law, what we think a cardinal error in the position taken by the learned judge of the court below will be apparent. The libel distinctly charges the respondents with negligence of these primary personal duties of a master, to wit, the duty of using reasonable care that the tools or appliances which he has furnished to his own workmen, or to others, shall be free from defects endangering the safety of those using them, and that the servants he shall furnish to operate them shall be selected with reasonable care and scrutiny as to their skill and competence. This well understood ground of liability is the only one upon which the libel rests, and we think, moreover, in view of all the circumstances of the case, it was well chosen, as being the only one upon which liability of respondent could possibly have been predicated; but a careful reading of the testimony convinces us that there is no evidence of negligence on the part of the respondents in the respect thus charged. There was no serious attempt to show that the seaman employed to operate the winch had exhibited incompetence or unskillfulness, or want of skill, in respect thereto, prior to the accident, much less that any instance or evidence of incompetence was known to the respondents. On the contrary, it appears from all the evidence, that the captain was quite justified in believing him to be competent and skillful at the time of his first employment in the capacity of winchman, and nothing was shown to have oc-

curred, down to the time of the accident, calculated to change that belief. More than this, the record discloses positive testimony tending to show skill and competence on the part of Flynn in this particular employment. He testifies himself that, as a seaman, he has been employed in operating winches, at intervals, for 28 years, and that on the ship now libeled, he had constantly been employed since articled thereon as a seaman. It seems to us that the libelant has signally failed to show negligence, in regard to this primary duty of exercising reasonable care, in the employment of the men furnished to operate the winch. While it is necessary to define and insist on strict compliance with this duty imposed upon the master, it would be unjust as well as illogical to allow the first instance of negligence on the part of the servant to be evidence of an incompetence and unskillfulness, of which the master ought to have known at the time of the servant's employment. We must deal with human nature as it exists, and the rules of human conduct prescribed by law, in their practical application, take into account its weaknesses and imperfections. It is common experience that a workman, be he ever so competent and skillful, may at some time and on some occasion fail to live up to his own standards.

The true and just rule applicable to the present case is well stated by the Circuit Court of Appeals for the Eighth Circuit, in the recent case of Southern Pacific Co. v. Hetzer, 135 Fed. 280, 68 C. C. A. 34:

"But specific acts of negligence, of lack of skill, or of incompetence, of which the master had no notice or knowledge prior to the alleged accident, are inadmissible to establish the incompetence of a servant who is employed with due care."

The learned judge of the court below, having stated that the contention of the respondents is that "upon the pleadings the libelant is confined to the allegations of fault contained in the charge of negligence on the part of the respondents, due to the danger of having improperly constructed the boom or gaff, and in allowing the same to be managed by an incompetent and inexperienced person," afterwards says:

"I find, however, from all the evidence and circumstances, that this injury resulted from the negligence of the winchman."

And then, after discussion of what that negligence consisted in, the learned judge uses this language:

"We are of opinion that a negligent person at a position requiring care and caution is incompetent. Incompetency includes want of qualification generally, and we hold that the question of the winchman's negligence is an issue fairly raised by the pleadings, and for which the respondents are responsible if he is not a fellow servant."

It does not seem entirely clear, whether this language means that the isolated alleged act of negligence on the part of the winchman, at the time of the accident, was evidence of a general incompetence of which knowledge should have been imputed to the respondents before the accident, and that in this respect "the winchman's negligence is an issue fairly raised by the pleadings," or whether it means that an allegation in the pleadings, of a want of due and reasonable care in

selecting the servant employed at the winch, may also relate to and cover an isolated act of negligence by said winchman at the time of the accident, even though the allegation of want of due and reasonable care in his selection and employment is actually disproved.

From what has been already said, it must be manifest that the meaning first suggested is inadmissible, and we think the other is equally so. No system of pleading, however inartificial or even lax, can permit such a discrepancy between the allegata and probata. It does not help the situation to suggest, as do the counsel for the libelant, that if the winchman was an employé of the ship against which the action is brought, it is immaterial whether he was competent or not, as the action is not brought by an employé of the ship, and that therefore the doctrine of fellow servant not applying, the ship is liable to libelant for the negligence of its servant. Admitting this to be true for the sake of the argument, it still remains, that the reason and philosophy of all rules of pleading, in admiralty as well as elsewhere, require that the ground of liability in an action for negligence should be so stated as to inform the party pursued of the real nature and gravamen of his alleged offense. If he be liable on either of two grounds, as distinct and differentiated as those we have discussed in the present case, the statement of one of them alone will not suffice as a statement of the one omitted. In the case before us, the respondents are informed by the libel, that the libelant relies for his recovery upon their alleged negligence and carelessness, in allowing the winch to be managed by an incompetent and inexperienced person—as we have said, a clear, definite and well-understood ground of liability. Upon an issue framed on this allegation, the respondents are required only to meet the proof in support thereof. They are not required, and cannot reasonably be expected to meet the proofs as to another ground of liability not stated, to wit, an isolated act of negligence of the servant employed, even if such other ground of legal liability exist. In the libel, the respondents are charged with dereliction of a personal duty—a willfully committed offense, and no other ground of liability is suggested. There is nothing so peculiar in admiralty pleading, as would allow another and different ground, in which there is no element of personal dereliction or offense, to be urged in substitution for the only ground alleged in the libel. We think, therefore, that the learned judge of the court below erred in holding that the question of the winchman's negligence, upon the single occasion in question, in either of the aspects discussed, was an issue fairly raised by the pleadings.

It would seem that counsel for libelant had deliberately predicated their case on the theory, that an allegation of respondent's negligence, in knowingly furnishing an incompetent and inexperienced person to operate the winch, would, if proved, establish liability, and on that theory alone. This is to us the more probable, in view of the opinion we entertain, that under the facts and circumstances of the case, as disclosed in the record, the respondents are not legally responsible for the isolated act of negligence of the winchman, which it is alleged caused the injury. The unloading was being conducted by a master

stevedore, under a contract with the charterers or consignees. The charter party itself gave this option of unloading to the charterers or consignees. For it, they were paid by a reduction in freight. The charter party, also as we have seen, provided that to those engaged in the unloading, the ship should furnish the use of its winches, the men to operate them, and the steam from the ship's boilers. The testimony shows that this was done, and that the stevedores who had the unloading in charge, had the use and full control of the ship's winches, and that the men operating them were also under their direction and control. In a sense, this use of winches and men was paid for by the stevedores, because they doubtless received less on their contract for unloading, by reason of their being furnished to them. During the active operation of unloading, there can be no question on the evidence, that the winchman was as much under the direction and control of the stevedore as were any of the men employed by him. The winchman turned on the steam, lowered, hoisted, and stopped, by direction of the stevedore. The captain and mate both testify that the officers of the ship had no direction or control of him in the actual work of unloading, and that he could have at any time been removed from that work, and another put in his place, by the stevedore. If the winchman showed incompetence, it would have been the duty of the stevedore to have exercised this power of removal, or at least to have refused to carry on the work of unloading while he was at the winch. We think in this respect there is complete analogy of this case, to one where the general servant of another is loaned or hired by the master for some special service, so as to become, as to that service, the servant of such other party. In such case, if the general employer has exercised due care to see that his servant, when employed, is competent and skillful, and has no knowledge that he is otherwise, at the time he is furnished for the special service, he has discharged his whole duty, and cannot be held responsible for an act of negligence of the servant so furnished, loaned, or hired, while he is working on such special service under the direction and control of the special master. In the present case, we agree with the contention of respondents, that, owing to the fact that the ship fully performed its duty under the charter party, by furnishing a competent winchman to work for the charterers, or stevedores employed by them, the ship is not responsible for acts of negligence, if any, on the part of the winchman, during the unloading, whether, as a matter of law, the winchman should be deemed a fellow servant of the libelant, or not. If the suit were against the stevedore, the question of fellow servant, as between the libelant and the winchman, would properly arise.

We have carefully read many of the numerous cases and authorities referred to by counsel on both sides, but do not consider it necessary to make reference to them here, further than to say that we believe the views we have expressed are in accord with the principles laid down in the best considered of these cases. That there is a want of harmony in the cases as to the general question, whether men in the position of the libelant and winchman are fellow servants, is recog-

nized in the cases relied upon by the counsel for the libelant. The first of these is The Slingsby, 120 Fed. 748, 57 C. C. A. 52, in which the Court of Appeals for the Second Circuit, in a case very like the present, directly decides that the winchman was the servant of the ship, and not of the stevedore, and that the ship was liable to the plaintiff for his negligence. We regret that we are not able to agree with the conclusions of law and fact reached by that eminent court. In a case like the present, we think the true test of fellow servant is, whether both are, at the precise time of the accident, working in a common employment, under the same general control and direction. We think reason and the weight of authority supports this view. Murray v. Curry, L. R. 6 C. P. 24; Rourke v. White Moss Colliery Co., L. R. 2 C. P. Div. 205; Donovan v. Laing, L. R. (1893) 1 Q. B. 629; The Joseph John, 86 Fed. 471, 30 C. C. A. 199; Wylie v. Palmer, 137 N. Y. 248, 33 N. E. 381, 19 L. R. A. 285; Kimball v. Cushman, 103 Mass. 194–198, 4 Am. Rep. 528; Clapp v. Kemp, 122 Mass. 481.

In Rourke v. White Moss Colliery Co., L. R. 2 C. P. Div. 205 (supra), the defendants had contracted with W. to do the sinking and excavating of a shaft at their colliery, and agreed to place at the disposal of W. engine power and an engineer to work the engine, who was employed and paid by the defendants. It was held, affirming the judgment of the Common Pleas, that though the engineer remained the general servant of defendants, yet, being under the orders and control of W. at the time of the accident, he was acting as the servant of W. and not of defendants, who were therefore not liable for his negligence. We think Chief Justice Cockburn's statement of the situation applies to the case at bar, where he says:

"Whereas Whittle would have been obliged to hire an engine and engineers in order to carry out the excavation which he had undertaken, the company, having already an engine and attendants on the spot, say to the contractor: 'We have got an engine and enginemen ready, and it shall be part of the contract that we will let you have them to do your work and to be under your control, and we will pay you so much the less per yard than we should have done had you been obliged to find the engine and pay the engineer yourself'. It appears to me that the defendants put the engine and this man Lawrence at Whittle's disposal, just as much as if they had lent both to him."

The conclusion of law followed in this case as it does in the case at bar, that the plaintiff was the fellow servant of the engineer at the time of the accident.

The ship being only pledged to furnish to the stevedores winches and winchmen, to be used in the unloading of the ship, its whole duty was performed when it furnished properly constructed winches in good order, and winchmen selected and employed with due and reasonable care as to their skill and competence. Under the circumstances, the libelant's only ground of action against the ship would be negligence in the performance of this duty. He was therefore right in his theory of the case and statement of the ground of liability relied upon; but as he failed to sustain that statement, he was not entitled to a decree.

For the reasons stated, the decree of the court below is reversed, and the cause will be remanded to that court, with direction to enter a decree dismissing the libel, with costs.